IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE TRUSTEES OF THE NATIONAL AUTOMATIC SPRINKLER INDUSTRY PENSION FUND, | * | |
| | * | |
| Plaintiffs, | * | Civil No. TDC-18-248 |
| v. | * | |
| LIFE SAFETY ENGINEERED SYSTEMS, INC., | * | |
| Defendant. | | |

\* \* \* \* \* \*

**REPORT AND RECOMMENDATION**

This Report and Recommendation addresses the Motion for Entry of Default Judgment ("Motion") (ECF No. 11) filed by Plaintiffs, the Trustees of the National Automatic Sprinkler Industry Pension Fund (the "Fund"). Defendant Life Safety Engineered Systems, Inc. ("Life Safety") has not filed a response, and the time for doing so has passed. *See* Loc. R. 105.2(a). On August 21, 2018, in accordance with 28 U.S.C. § 636 and pursuant to Local Rule 301.6, Judge Chuang referred this case to me for a report and recommendation on the Fund's Motion. (ECF No. 12.) I find that a hearing is unnecessary in this case. *See* Fed. R. Civ. P. 55(b)(2); Loc. R. 105.6. For the reasons set forth below, I respectfully recommend that the Fund's Motion be granted.

**I.    FACTUAL AND PROCEDURAL HISTORY**

In this case, the Fund filed suit against Life Safety under the Employee Retirement Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover for Life

Safety's withdrawal liability and related relief.[1] (ECF No. 1.) Life Safety was personally served with the Complaint and summons (*see* ECF No. 6), but it did not file an answer or responsive pleading within the requisite time period. On April 6, 2018, the Fund moved for the Clerk's entry of default (ECF No. 9), and the Clerk entered default against Life Safety on the same day (ECF No. 10). On April 20, 2018, the Fund filed the Motion, to which Life Safety has not responded.

---

[1] The Fourth Circuit has recently summarized withdrawal liability under ERISA:

Congress enacted ERISA to promote the "soundness and stability of [employee benefit] plans" in private industry. 29 U.S.C. § 1001(a). Specifically, ERISA protects "the interests of employees and their beneficiaries" by establishing "minimum standards ... assuring the equitable character of such plans and their financial soundness." *Id.* To further that end, Congress in 1980 passed the Multiemployer Pension Plan Amendments Act (the "MPPAA"). In part, the MPPAA

> requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's "unfunded vested benefits," calculated as the difference between the present value of vested benefits and the current value of the plan's assets.

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725, 104 S. Ct. 2709, 81 L.Ed.2d 601 (1984) (citing 29 U.S.C. §§ 1381, 1391). The purpose of assessing withdrawal liability is "to assign to the withdrawing employer a portion of the plan's unfunded obligations in rough proportion to that employer's relative participation in the plan over the last 5 to 10 years." *Borden, Inc. v. Bakery & Confectionery Union & Indus. Int'l Pension*, 974 F.2d 528, 530 (4th Cir. 1992).

An employer owes withdrawal liability when it makes a complete or partial withdrawal from a pension plan. 29 U.S.C. § 1381(a). In the building and construction industry, a complete withdrawal occurs when: (1) "an employer ceases to have an obligation to contribute under the plan, and" (2) the employer "continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." 29 U.S.C. § 1383(b)(2).

*Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 440 (4th Cir. 2015).

## II. LEGAL ANALYSIS

### A. Standard for Entry of Default Judgment

In determining whether to award a default judgment, the Court accepts as true the well-pleaded factual allegations in the complaint as to liability. *See Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780-81 (4th Cir. 2001); *United States ex rel. Durrett-Sheppard Steel Co. v. SEF Stainless Steel, Inc.*, No. RDB-11-2410, 2012 WL 2446151, at *1 (D. Md. June 26, 2012). Nonetheless, the Court must consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law. *Ryan*, 253 F.3d at 780. Although the Fourth Circuit has a "strong policy that cases be decided on the merits," *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993), default judgment "is appropriate when the adversary process has been halted because of an essentially unresponsive party." *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005). If the Court determines that liability is established, the Court must then determine the appropriate amount of damages. *CGI Finance, Inc., v. Johnson*, No. ELH-12-1985, 2013 WL 1192353, at *1 (D. Md. March 21, 2013). The Court does not accept factual allegations regarding damages as true, but rather must make an independent determination regarding such allegations. *Durrett-Sheppard Steel Co.*, 2012 WL 2446151 at *1.

Rule 55 of the Federal Rules of Civil Procedure provides that "[i]f, after entry of default, the Plaintiff's Complaint does not specify a 'sum certain' amount of damages, the court may enter a default judgment against the defendant pursuant to Fed. R. Civ. P. 55(b)(2)." A plaintiff's assertion of a sum in a complaint does not make the sum "certain" unless the plaintiff claims liquidated damages; otherwise, the complaint must be supported by affidavit or documentary evidence. *United States v. Redden*, No. WDQ-09-2688, 2010 WL 2651607, at *2 (D. Md. June 30, 2012). Rule 55(b)(2) provides that "the court may conduct hearings or make referrals . . .

when, to enter or effectuate judgment, it needs to . . . determine the amount of damages." The Court is not required to conduct an evidentiary hearing to determine damages, however; it may rely instead on affidavits or documentary evidence in the record to determine the appropriate sum. *See, e.g.*, *Mongue v. Portofino Ristorante*, 751 F. Supp. 2d 789, 795 (D. Md. 2010).

**B.    Liability**

ERISA provides that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined . . . to be the withdrawal liability." 29 U.S.C. § 1381(a). For an employer that has an obligation to contribute under a plan for work performed in the building and construction industry, such as Life Safety, a complete withdrawal occurs when the employer "ceases to have an obligation to contribute under the plan," and "resumes [work in the jurisdiction of the relevant collective bargaining agreement] within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." 29 U.S.C. § 1383(b)(2). "An action to compel an employer to pay overdue withdrawal liability is treated the same as an action to collect delinquent contributions." *Trustees of the Plumbers & Pipefitters Nat. Pension Fund*, 791 F.3d at 445 (citing 29 U.S.C. § 1451(c)).

ERISA further provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. Employers who fail to make timely contributions are liable in a civil action for unpaid contributions, interest on the unpaid contributions, liquidated damages, reasonable attorney's fees and costs, and any other relief the Court deems appropriate. 29 U.S.C. § 1132(a), (g).

The following facts are taken from the Complaint (ECF No. 1) and the Fund's Memorandum in support of its Motion (ECF No. 11-1) and the exhibits attached thereto. The Fund alleges that it is a multiemployer employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2), (3), (37), and 1301(a)(3). (ECF No. 1 ¶ 1.) The Fund is established and maintained pursuant to a Restated Agreement and Declaration of Trust ("Trust Agreement") and Collective Bargaining Agreements between affiliated local unions of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, AFL-CIO ("United Association"), and employers such as Life Safety. (*Id.*)

Beginning in 2005, Life Safety was obligated to contribute to the Fund on behalf of its employees pursuant to successive collective bargaining agreements between Local Union No. 669 of the United Association ("Local 669") and the National Fire Sprinkler Association, Inc. (collectively, the "Collective Bargaining Agreement'). (*Id.* ¶ 5.) Most recently, on or about March 27, 2013, Life Safety entered into an Assent and Interim Agreement ("Assent") with the Road Sprinkler Fitters Local Union 669. A signed copy of the Assent is filed at ECF No. 11-7. Under the Assent, Life Safety agreed to remain bound by the terms of the Collective Bargaining Agreement then in effect, and to be bound by any future Collective Bargaining Agreement, and all amendments, addendums, and supplements thereto. (ECF No. 11-7 ¶¶ 2-3.) Life Safety also agreed to be bound "by the Declarations of Trust establishing a Local Union 669 Health and Welfare Fund." (*Id.* ¶ 4.)

A copy of the Collective Bargaining Agreement in effect between April 1, 2013 through March 31, 2016, and to which Life Safety agreed to be bound, is filed at ECF No. 11-8. Among other things, the Collective Bargaining Agreement required Life Safety to make certain contributions to the Fund for each hour worked by Life Safety's employees covered by the

Collective Bargaining Agreement. (*See* ECF Nos. 11-4 at 3; 11-9 at 32-33, 38-39.) A copy of the Restated Agreement and Declaration of Trust ("Trust Agreement") to which Life Safety agreed to be bound is filed at ECF No. 11-9, and a copy of the Rules and Regulations of the National Automatic Sprinkler Industry Pension Plan ("Plan") is filed at ECF No. 11-10.[2]

After the March 31, 2016, expiration of the Collective Bargaining Agreement, Life Safety did not sign a successor agreement with Local 669 and stopped contributing to the Fund. (ECF No. 11-4 at 3.) In or around June 2017, the Fund learned that following the March 31, 2016, expiration of the Collective Bargaining Agreement, Life Safety "performed work in the sprinkler industry of the type for which contributions to the Fund were previously required . . . under the Collective Bargaining Agreement." (*Id.*; *see also* ECF No. 11-8 at 31, 49-52.) The work that Life Safety performed was within Local 669's jurisdiction. (*Id.*) Such work occurred "within five years after the date on which [Life Safety's] obligation to contribute to the Fund ceased," and at a time when it had not signed "a new Collective Bargaining Agreement with Local 669 or otherwise renewed its obligation to contribute to the fund." (ECF No. 1 ¶ 8.) The Fund determined that Life Safety experienced a complete withdrawal from the Fund. (ECF No. 11-1 at 2.)

Upon determining that Life Safety had experienced a complete withdrawal from the Fund, the Fund requested that an actuary determine the amount of Life Safety's withdrawal liability. (ECF No. 11-4 at 3-4.) The Fund determined that Life Safety's withdrawal liability was

---

[2] By signing the Assent, Life Safety "agree[d] to be bound by the [Trust Agreement]" and all amendments thereto. (ECF No. 11-7 at 2.) The Trust Agreement "grants the Trustees authority to establish a comprehensive plan of benefits and policies, rules, and procedures to carry out the purposes of the Trust Agreement, which are found in the Plan." (ECF No. 11-1 at 4; *see also* ECF No. 11-9 at 12-20.)

$37,326.00. A copy of the actuary's letter explaining the calculation of this sum is filed at ECF No. 11-11.

By letter dated July 7, 2017, the Fund notified Life Safety of the Fund's determination that it had experienced a complete withdrawal and that it owed withdrawal liability to the Fund in the amount of $37,326.00. (ECF Nos. 11-12 & 11-13.) The Fund's letter "provided a schedule for payment of the withdrawal liability amount requiring six (6) quarterly payments of $5,704.12 and one (1) final payment of $4,189.52 with the first payment due on September 1, 2017." (ECF No. 11-4 at 4.) A copy of the actuary's letter explaining the calculation of Life Safety's withdrawal liability was enclosed with the July 7, 2017, letter. (*Id.*)

Life Safety did not transmit to the Fund the first installment payment. (*Id.*) Thereafter, on October 13, 2017, the Fund notified Life Safety of its past-due installment and informed it that "if it did not cure its non-payment within sixty (60) days, then its entire outstanding withdrawal liability, plus interest, would become due and owing." (*Id.*; *see also* ECF Nos. 11-14 & 11-15.) Life Safety did not respond to the Fund's October 13, 2017, letter. (ECF No. 11-4 at 4.)

On December 18, 2017, after Life Safety's 60 day period to cure its non-payment had passed, the Fund notified Life Safety that it was in default. (ECF Nos. 11-16 & 11-17.) Life Safety did not request review of the Fund's withdrawal liability determination or make a demand for arbitration. (ECF No. 11-4 at 5.)

Accepting as true the unchallenged allegations of the Complaint, along with the evidence that the Fund submitted in connection with its Motion to show that Life Safety experienced a complete withdrawal from the Fund, the Fund has established Life Safety's liability for failure to pay its overdue withdrawal liability due to the Fund pursuant to the Collective Bargaining Agreement, the Trust Agreement, and the Plan. Life Safety's resumption of work in the

7

jurisdiction of Local 669 and the Collective Bargaining Agreement occurred within five years after the date on which Life Safety's obligation to contribute to the Fund ceased. At the time that Life Safety performed such work, it had not signed a new Collective Bargaining Agreement or renewed its obligation to contribute to the Fund. Accordingly, the Fund properly determined that Life Safety experienced a complete withdrawal from the Fund. The Fund properly notified Life Safety of its determination that it had experienced a complete withdrawal from the Fund and appropriately attempted to collect the withdrawal liability. *See* 29 U.S.C. § 1382.

### C. Damages

Having determined that the Fund has established Life Safety's liability, it is now appropriate to determine the damages to which the Fund is entitled. The damages the Fund seeks in its Motion are appropriate under Rule 54(c) so long as "the record supports the damages requested." *See Laborers' Dist. Council Pension v. E.G.S., Inc.*, No. WDQ-09-3174, 2010 WL 1568595, at *3 (D. Md. Apr. 16, 2010). Here, the Fund has provided sufficient evidence to support its claim for damages in the amount of $48,237.14.

"The failure of an employer to make a withdrawal liability payment is to be treated in the same manner as a delinquent contribution under 29 U.S.C. § 1145." *Trustees of the Nat'l Automatic Sprinkler Indus. Pension Fund v. Edward J. Matthews, Inc.*, No. GJH-16-2733, 2017 WL 3296337, at *5 (D. Md. July 31, 2017). Under 29 U.S.C. § 1132(g)(2), in any action brought to enforce the payment of delinquent contributions, and in which a judgment in favor of the plan is awarded, the Court is required to award the plan:

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

8

> > (i) interest on the unpaid contributions, or
> >
> > (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>
> (E) such other legal or equitable relief as the court deems appropriate.

29. U.S.C. 1132(g)(2). "Interest on unpaid contributions shall be determined using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26." *Id.*

In support of its claim for damages, the Fund relies on a declaration signed by Michael W. Jacobsen ("Jacobsen"), the Fund' Administrator. (ECF No. 11-4.) First, the Fund seeks damages for Life Safety's withdrawal from the Fund. In support of the Fund's request for $37,326.00 in damages for Life Safety's withdrawal liability, Jacobsen incorporates the letter from the Fund's actuary dated June 30, 2017.[3] (ECF No. 11-11.) This letter, along with the Fund's letter to Life Safety dated July 7, 2017, provides sufficient documentation for the calculation of Life Safety's withdrawal liability in the amount of $37,326.00. *See Trustees of the Nat'l Automatic Sprinkler Indus. Pension Fund*, 2017 WL 3296337, at *4 n.6 (accepting a fund's notice letter and attached calculation as sufficient documentation for the calculation of an employer's withdrawal liability in the context of a motion for default judgment). I recommend that the Court award the Fund $37,326.00 for Life Safety's withdrawal liability.

---

[3] "The MPPAA charge-determination section, § 1391, sets forth rules for calculating a withdrawing employer's fair share of a plan's underfunding.'" *Asbestos Workers Local 24 Pension Fund v. NLG Insulation, Inc.*, 760 F. Supp. 2d 529, 542 (D. Md. 2010) (quoting *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 417 (1995). This section "imposes withdrawal liability for an amount 'that roughly matches the employer's proportionate share of the plan's unfunded vested benefits.'" *Id.* (*quoting Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997).

The Fund also seeks interest on Life Safety's unpaid withdrawal liability. Under the terms of the Plan, the Fund may charge interest "from the date the payment was due to the date it is paid at an annual rate equal to the prime rate charged by [JP Morgan Chase & Co.] on the first day of the calendar quarter preceding the due date of the payment." (ECF Nos. 11-4 at 5-6; 11-10 at 103.) On the first day of the calendar quarter preceding the September 1, 2017, due date of Life Safety's first payment, the prime rate was 4.00%. The Fund seeks interest on Life Safety's unpaid withdrawal liability in the amount of $870.94 (for the period of September 1, 2017, through April 1, 2018), and continuing to accrue through the date of payment. I recommend that the Court grant the Fund's request for interest on Life Safety's unpaid withdrawal liability in the amount of $870.94 (for September 1, 2017, through April 1, 2018), and continuing to accrue through the date of payment.[4]

The Fund also seeks liquidated damages. Under the Plan, and consistent with 29 U.S.C. § 1132(g)(2)(C), the Fund is entitled to "liquidated damages equal to the greater of – (1) the amount of interest charged on the unpaid balance, or (2) 20 percent of the unpaid amount awarded." (ECF No. 11-10 at 104.) Here, 20 percent of the unpaid withdrawal liability is $7,465.20, which is greater than the amount of interest charged on the unpaid balance. I recommend that the Court award the Fund $7,465.20 in liquidated damages.

The Fund also seeks an award of attorney's fees and costs, which are available in ERISA cases. 29 U.S.C. §1132(g)(2). When a court enters judgment in favor of the plaintiff in an ERISA action for a plan to recover unpaid contributions, it "shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant." *Id*. In calculating an award

---

[4] The Plan provides that "[f]or each succeeding twelve (12) month period that any amount in default remains unpaid, interest will be charged on the unpaid balance (including accrued interest) at the prime rate in effect on the anniversary date of the date as of which the initial interest rate was determined." (ECF No. 11-10 at 103.)

of attorney's fees, the court must determine the lodestar amount, defined as a "reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. The Mills Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008). The Fourth Circuit has stated that a court's

> discretion should be guided by the following twelve factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). In addition, Appendix B to this Court's Local Rules ("Rules and Guidelines for Determining Attorneys' Fees in Certain Cases") provides that lawyers admitted to the bar for twenty years or more may reasonably bill $300-475 per hour and that lawyers admitted to the bar for less than five years may reasonably bill $150-225. These rates serve as guidelines in determining the reasonableness of hourly rates.

Throughout this litigation, the Fund has been represented by Dinah S. Leventhal ("Ms. Leventhal") and Jacob N. Szewczyk ("Mr. Szewczyk") of the law firm O'Donoghue & O'Donoghue LLP. (*See* ECF No. 11-6.) Ms. Leventhal has been a licensed attorney for more than 21 years. (*Id.* ¶ 1.) She charged a rate of $310.00 per hour in this case. (*Id.* ¶ 4.) This rate is within the guidelines set forth in the Local Rules and I find it to be a reasonable hourly rate. Mr. Szewczyk has been a licensed attorney for less than five years and charged a rate of $225.00 per hour in this case. (*Id.*) This rate is also within the guidelines set forth in the Local Rules and I find it to be a reasonable hourly rate.

I further find that the time that Ms. Leventhal and Mr. Szewczyk spent working on this case, which is detailed in an attachment to Ms. Leventhal's declaration (ECF No. 11-10 at 2), is

reasonable, especially in light of Ms. Leventhal's exercise of billing discretion regarding Mr. Szewczyk's hourly rate. I recommend that the Court award the Fund attorney's fees in the amount of $1,990.00.

Finally, the Fund incurred a total of $585.00 in costs, which includes the $400.00 fee for filing the complaint and a $185.00 service fee. (*Id.* ¶ 6.) I recommend that the Court award the Fund costs in the amount of $585.00.

In total, I recommend that $48,237.14 in damages be awarded to the Fund against Life Safety. This amount is comprised of $37,326.00 in unpaid withdrawal liability; $870.94 in interest through April 1, 2018; $7,465.20 in liquidated damages; $1,990.00 in attorney's fees; and $585.00 in costs. I also recommend that the Fund be awarded interest continuing to accrue through the date of payment.

### III. CONCLUSION

In sum, I recommend that the Court:

1. Grant the Motion for Default Judgment (ECF No. 11) filed by Plaintiffs, the Trustees of the National Automatic Sprinkler Industry Pension Fund;

2. Enter judgment in favor of the Plaintiffs against Defendant Life Safety Engineered Systems, Inc. in the amount of $48,237.14, plus interest to accrue through the date of payment.

I also direct the Clerk to mail a copy of this Report and Recommendation to Defendant Life Safety Engineered Systems, Inc.

Objections to this Report and Recommendation must be served and filed within fourteen (14) days, pursuant to Fed. R. Civ. P. 72(b) and Local Rule 301.5(b).

<u>October 4, 2018</u>                          _____/s/_____
Date                                             Timothy J. Sullivan
                                                 United States Magistrate Judge